# Exhibit F



Solicitor of Labor
Division of Management and Administrative Legal Services
U.S. Department of Labor
200 Constitution Avenue, NW Room N2420
Washington, DC 20210

March 1, 2019

VIA U.S. MAIL AND ELECTRONIC DELIVERY

**Re: Freedom of Information Act Appeal FOIA No. 848514**

To Whom It May Concern:

    The Center for Investigative Reporting ("CIR") hereby writes to appeal on behalf of the requester, Mr. Will Evans pursuant to the Freedom of Information Act, 5 U.S.C. § 552 from the denial sent by the Department of Labor's Office of Federal Contract Compliance Programs ("OFCCP") on February 22, 2019, involving disclosure of federal contractor employment diversity reports.

    I.    **Factual Background**

    The OFCCP collects from federal contractors Employer Information ("EEO-1") forms, a survey conducted annually under the authority of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et. seq*., as amended. *See* EEOC, *EEO-1 Instruction Booklet* (2018), *available at* http://bit.ly/2ySvqzB. According to Title VII, all employers in the United States with 15 or more employees are required to keep employment records and certain large employers are required to annually file an EEO-1 report based on those records. *Id.*

    EEO-1 reports are permitted to be disclosed and not confidential. While the Equal Employment Opportunity Commission ("EEOC") is prohibited from disclosing EEO-1 reports under Title VII of the Civil Rights Act of 1964, this restriction does not apply to OFCCP and its employees. EEOC, *EEO-1 Instruction Booklet*, *supra*. Moreover, "[t]he confidentiality provision of…Title VII" does not apply to federal government contractors. *Id.* And as the EEOC suggests on its website, these records may be made public. It writes, "[m]any years ago, the courts ruled that the prohibition

against disclosure in Title VII does not apply to federal government prime contractors or first-tier subcontractors." EEOC, *EEO-1 Frequently Asked Questions* (2018), *available at* https://www.eeoc.gov/employers/eeo1survey/faq.cfm.

Agency practice supports this understanding. Most recently, the agency released EEO-1s after CIR filed a lawsuit last year. *See CIR v. DOL*, (OFCCP), No. 3:18-cv-1008-JCS (N.D. Cal. 2018). The government now denies a subsequent request filed over a year ago – for nearly identical records – by claiming that it must wait for the Supreme Court to decide a case involving Exemption 4. Given the records do not contain any commercial, financial, or confidential information, the agency's further delay appears to be an effort to stymy transparency and government accountability.

## II.    Procedural History

On January 4, 2018, Mr. Evans submitted a FOIA request to OFCCP, (hereinafter "the Request"). A true and correct copy of the Request is attached as Exhibit A. The Request sought 2016 EEO-1 Consolidated Reports (Type 2) for 55 companies (some of which disclosed their 2015 reports). On January 9, 2018 the agency acknowledged the request. A true and correct copy of that email is attached as Exhibit B. On March 13, 2018, April 18, 2018, and August 14, 2018, the agency sent interim responses. A true and correct copy of those responses is attached as Exhibit C. The agency provided the EEO-1 reports for 15 companies in its August response. *Id.*

For months following its August response, the agency was unresponsive to the Request. Meanwhile, on November 29, 2018, OFCCP released the same EEO-1 documents for a different calendar year to CIR in a separate action filed in federal court. *See CIR v. DOL*, (OFCCP), No. 3:18-cv-1008-JCS (N.D. Cal. 2018). A true and correct copy of that disclosure email is attached as Exhibit D. In January 2019, CIR was able to schedule a phone call as to the Request. On January 15, 2019, agency representatives stated during the phone call that they would be sending a final correspondence *i.e.* a closure letter that was currently in clearance with agency counsel. Agency counsel also represented that the letter would likely be sent out within the next week.

CIR repeatedly followed up, but weeks passed with no response. CIR was finally able to schedule a second call for February 22, 2019 after it represented it would be filing a lawsuit. On February 22, OFCCP represented that it would be putting a stay on the case to await the Supreme Court decision in *Food Marketing Institute v. Argus Leader Media*, 889 F.3d 914 (9th Cir. 2019), *cert granted*, 2019 WL 166877 (U.S. Jan. 11, 2019) (No. 18-841). CIR responded that it did not think a stay was appropriate in this case, as none of the information was commercial, financial, or confidential. CIR expressed that it would likely file suit. OFCCP then issued a letter immediately after the call procedurally requiring CIR to file an administrative appeal (hereinafter "the Denial"). A true and correct copy of that responses is attached as Exhibit E.

The Denial letter states "While processing your request, on January 11, 2019, the Supreme Court granted a writ of certiorari in *Food Marketing Institute v. Argus Leader Media*, 889 F.3d 914 (9th Cir. 2019), *cert granted*, 2019 WL 166877 (U.S. Jan. 11, 2019) (No. 18-841)." *Id.* It continued "The questions presented in *Argus Leader* include the appropriate definition of 'confidential' in the Freedom of Information Act's Exemption 4, and in the alternative whether the 'substantial competitive' harm test...will be retained or altered.'" *Id.* "Given that the Court's answer to those questions may affect how OFCCP would address the request at issue, we are delaying a final determination regarding disclosure until we have the benefit of the Court's decision in *Argus Leader*." The Denial did not explain why Exemption 4 was appropriate or how *Argus Leader* would impact its Exemption 4 analysis. *Id.* It also concluded that Mr. Evans was a news media requester. *Id.*

This letter now appeals from the Denial of the Request. This appeal is timely according to 29 C.F.R. § 70.

**III.     Argument**

FOIA's "basic purpose reflect[s] a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 360-61 (1976) (internal citations and quotation marks omitted). Under FOIA Exemption 4, an agency may only withhold information if it proves disclosure would release (1) trade secrets or commercial or financial information that is (2) obtained from a person and (3) is privileged or confidential. 5 U.S.C. § 552(b)(4). The purpose of this exemption is to "balance the strong public interest in favor of disclosure against the right of private businesses to protect sensitive information." *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768–69 (D.C. Cir. 1974).

Here, the OFCCP cannot meet its burden and show that the withheld information is exempt as a trade secret or commercial information – no matter what test is applied. Even if Exemption 4 applies, the strong public interest weighs in favor of disclosure against any possible private business interest. Regardless, the agency's tactics appear capricious at best. The agency's attempt to stay also signals bad faith. Indeed to permit a stay would lead to deleterious confusion as to all public records requests, given that FOIA case law is constantly evolving.

### A. Withholding is improper under Exemption 4 because the records requested are not trade secrets.

Under Exemption 4, a trade secret is defined as "a secret, commercially valuable plan, formula, process, or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial effort." *Pub. Citizen Health Research Grp. v. Food & Drug*

*Admin.*, 704 F.2d 1280, 1289 (D.C. Cir. 1983); *Citizens Comm'n on Human Rights v. Food & Drug Admin., Eli Lilly & Co.*, No. 92CV5313, 1993 WL 1610471 at *7 (C.D. Cal. May 10, 1993), *aff'd in part and remanded in part on other grounds*, 45 F.3d 1325 (9th Cir. 1995). This definition of trade secrets applies only if the information is related to "the productive process itself," rather than "collateral matters of business confidentiality such as pricing and sales volume data, sources of supply and customer lists." *Pub. Citizen Health Research Grp.*, 704 F.2d at 1287. That is, there must be "a direct relationship between the information at issue and the productive process." *Id.*[1]

The requested records are not – under any interpretation – trade secrets. Based on the plain definition, EEO-1 reports cannot legitimately be described as revealing a valuable plan, formula, process or device. They merely describe diversity statistics of the company. The numbers in these reports are wholly divorced from the business of the contractors. Just as the health and safety records in *Pub. Citizen Health Research Grp.*, 704 F.2d at 1288 did not constitute trade secrets, "the relationship of the [EEO-1 reports] to the productive process [is] tangential at best." *Id.*

### B. The information is improperly withheld under Exemption 4 because it is not commercial information.

The documents cannot under any circumstance be defined as commercial. Regardless of any change in law, courts provide terms "their ordinary meanings." *Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1194 (9th Cir. 2011). Thus, commercial can only apply to information that is "of a commercial nature" or "serves a commercial function." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002). To define the term any broader, would allow it to swallow all information held by a company, so courts find "commercial or financial" to only apply to information if it directly relates to commerce. *Pub. Citizen*, 704 F.2d at 1280.

For instance, in *Watkins*, the Court found information about unlawful importation of counterfeit goods was "commercial" because it was directly connected to commercial activity. *Watkins*, 643 F.3d at 1194. Similarly, information about revenue, service pricing, and checking accounts has been defined as commercial. *See, e.g., Skybridge Spectrum Found. v. Fed. Commc'ns Comm'n*, No. 10-01496, 2012 WL 336160 at *12 (D.D.C. 2012); *Merit Energy Co. v. U.S. Dep't of Interior*, 180 F.Supp.2d 1184, 1188 (D. Colo. 2001). In contrast, a court did not find registration numbers posted on aircraft tails to be "commercial," as they could only be used to identify the aircraft and not the business purpose of a particular flight. *Nat'l Bus. Aviation Ass'n, Inc. v. FAA*, 686

---

[1] The limited nature of the definition of "trade secrets" was clarified in *Pub. Citizen Health Research Grp.*, where the United States Court of Appeals for the District of Columbia overturned a decision finding health and safety data from clinical studies constituted trade secrets. *Id.* at 1288. There the court said, "the relationship of the requested information to the productive process [was] tangential at best," and the information was not a "plan, formula, process, or device," it was not a trade secret under Exemption 4. *Id.*

1400 65th, Suite 200 Emeryville, CA 94608
PHONE 510 809 3160    TWITTER @CIRonline
    WEB cironline.org

F.Supp.2d 80, 86–7 (D.D.C. 2010). While the information could be used to gain "insight into the nature of a company's business dealings," the court held this did "not convert the aircraft registration numbers themselves into commercial information." *Id.*

The content of the Request cannot reasonably be described as financial or commercial under any possible definition – now or after the Court's decision in *Argus Leader*. The diversity statistics in the EEO-1 reports do not deal with the commercial activity of the contractors. The EEO-1 reports do not deal with the buying and selling of goods. They do not even deal with the company's own financial information like payment data. Instead, they merely reveal the demographics of the employees. To determine otherwise would render such a broad definition of "commercial" that it would be made meaningless.

### C. The information is improperly withheld under Exemption 4 because it is not confidential.

Information is confidential if disclosure of the information is likely to have either of the following effects: (1) impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained. *GC Micro Corp. v. Defense Logistics Agency*, 33 F.3d 1109, 1112 (9th Cir. 1994). The competitive injury must "be limited to harm flowing from the affirmative use of the proprietary information by competitors." *Pub. Citizen Health Res. Grp.*, 704 F.2d at 1291 n.30 (emphasis in original). The agency may not simply offer the court "conclusory and generalized allegations" of substantial competitive harm to support its redactions. *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 681 (D.C. Cir. 1976). Instead, it must provide "specific factual or evidentiary material to support [its] claim that harm is likely to result." *Id.* at 679.

Here, the government cannot meet its burden to show that the information is confidential under either prong. First, the disclosure of the information is not likely to impair OFCCP's ability to collect these forms in the future from contractors who decide to work with the government. *See Calderon v. U.S. Dep't of Agriculture*, No. 1:2014-cv-00425, 15-16 (D.D.C. 2017) ("When entities apply to [the agency] to take advantage of the Program's significant economic incentives, they will be obligated to provide the required transactional documents" so "disclosure … is not likely to impair [the agency's] ability to collect this information in the future"). If a contractor chooses to work with the government it is obligated to provide the required documents under Title VII, and a court order may order it to do so.

Second, disclosure would not cause economic harm among competitors. As in other cases, the information discloses nothing about the confidential information like the object of a company's contracts or subcontracts. *See GC Micro Corp*, 33 F.3d at 1112 (finding no economic harm where data on the percentage and dollar amount of work did not reveal "the unit prices charged by the subcontractors, and the profit or productivity

1400 65th, Suite 200 Emeryville, CA 94608
PHONE 510 809 3160   TWITTER @CIRonline
WEB cironline.org

rates of either the contractor or subcontractors"). In fact, even if OFCCP tried to claim that disclosure would create a competitive harm, that statement would be undermined by real life examples where EEO-1 forms have continuously been made public and caused no harm. For instance, to date, numerous companies have publicly published their forms online to promote diversity, including but not limited to Apple, Amazon, Cisco Systems, Google, Microsoft, Citrix Systems, Facebook, Intel, Intuit, Adobe, HP Inc., LinkedIn, eBay, Salesforce, Yahoo, Uber, Lyft and Twitter. Indeed, some of the federal contractors who are objecting here also publish diversity statistics on their own site. Many of the federal contractors at issue disclose a multitude of much more sensitive business information as part of required SEC disclosures, such as accounting, disclosures, goals and strategies, and the exact compensation of executives – and have caused no harm. Perhaps most importantly, OFCCP has previously overruled objections by companies, determined the records are not confidential, and released the reports. Thus, to claim EEO-1s are confidential appears to be nothing more than an abuse of the definition.

### D. Disclosure of information does not offend the purposes of FOIA, but instead leans heavily in favor of it.

The purpose of Exemption 4 is to "balance the strong public interest in favor of disclosure against the right of private businesses to protect sensitive information." *Nat'l Parks & Conservation Ass'n*, 498 F.2d at 768–69. Thus even if the exemption arguably applies, where disclosure would benefit the public and cause little harm to private interests courts will enforce disclosure. *Compare Gilmore v. United States Dep't of Energy*, 4. F. Supp. 2d 912, 923 (N.D. Cal. 1998) (withholding documents under Exemption 4 where "there is no countervailing public interest in disclosure"); *with Trans.-Pac. Policing Agreement v. United States Customs Serv.*, No. 97-2188, 1998 U.S. Dist. LEXIS 7800, at *14 (D.D.C. May 14, 1998) (concluding the agency's "proper application of Exemption 4 in this case [by disclosing] does not offend the purposes of FOIA"), *rev'd & remanded for segregability determination*, 177 F.3d 1022 (D.C. Cir. 1999).

The importance of public disclosure of EEO-1 reports for promoting diversity is incontrovertible. It has been championed by civil rights activists such as Rev. Jesse Jackson Sr., members of Congress, investment firms, and companies themselves. *See, e.g.*, Salvador Rodiguez, *Jesse Jackson Gives Uber a Diversity Deadline*, INC.COM, Jan. 5, 2017, https://www.inc.com/salvador-rodriguez/uber-diversity-jesse-jackson.html; Jessica Guyun, *Barbara Lee calls on Apple, tech holdouts to release diversity data*, USATODAY, Aug. 4, 2015, https://www.usatoday.com/story/tech/2015/08/04/barbara-lee-black-caucus-federal-diversity-data-apple/31128479/. The Federal Glass Ceiling Commission, created by the Civil Rights Act of 1991, stated in its 1995 report that it "urges the Federal government and its agencies to look for ways to increase public access to diversity data" and that "[t]he government should also explore the possibility of mandating public release of EEO-1 forms for Federal contractors and publically traded corporations." Federal Glass Ceiling Commission, *A Solid Investment: Making Full Use of the Nation's Human Capital* (1995).

The reports have also formed the basis of numerous news articles that are of the utmost importance in order to inform the public about the real problems about lack of diversity in the tech industry. *See, e.g.*, Will Evans & Sinduja Rangarajan, *Hidden figures: How Silicon Valley keeps diversity data secret*, REVEAL.ORG, Oct. 19, 2017, https://www.revealnews.org/article/hidden-figures-how-silicon-valley-keeps-diversity-data-secret/; Sinduja Rangarajan, *Here's the clearest picture of Silicon Valley's diversity yet: It's bad. But some companies are doing less bad*, REVEAL.ORG, June 25, 2018, https://www.revealnews.org/article/heres-the-clearest-picture-of-silicon-valleys-diversity-yet/; Laura Lorenzetti, *Microsoft releases diversity stats: How the tech giant sizes up*, FORTUNE, Jan. 5, 2015, http://fortune.com/2015/01/05/microsoft-eeo-1-diversity-tech/; Jessica Guynn, *Apple leadership is more than 80% white and male*, USATODAY, Nov. 9, 2017, https://www.usatoday.com/story/tech/2017/11/09/apple-leadership-more-than-80-white-and-male/850206001/.

### E. OFCCP should not fail to fulfill its statutory obligation by raising the strawman of an undecided Supreme Court case.

While the upcoming *Argus Leader* case involves Exemption 4 – it does not justify the agency withholding records. While courts permit an agency to change its determination about a FOIA request based on a change in the law, courts generally do not permit agencies to artificially extend their time to fulfill a FOIA request just because a case is pending. To rule otherwise would undermine the finality of all current caselaw and promote uncertainty in the FOIA process, as caselaw is always developing. *See generally Maydak v. U.S. Department of Justice*, 218 F.3d 760 (D.C. Cir. 2000) (discussing the need for judicial finality). Moreover, courts find it is opprobrious to cite to an Exemption or use a procedural avenue to merely guard against "embarrassment in the marketplace or reputational injury." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 564 (D.C. Cir. 2010) (citing *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 341 (D.C. Cir. 1989).

Indeed, courts do not look favorably at agencies that try to evade their statutory obligation and reverse course. In *Maydak v. U.S. Department of Justice*, 218 F.3d 760 (D.C. Cir. 2000), the government argued that it should be permitted to assert categorical exemptions at a preliminary stage of the proceedings, and then "start back at the beginning" in assessing whether an additional, more targeted, exemption would apply. *Id.* The Court decided that such behavior could not be permitted. Generally, such capricious actions are often not looked upon favorably. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ("[A]n [u]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice."); *United States v. Mead*, 533 U.S. 218, 228 (2001) (explaining that deference is reduced when an agency position lacks consistency).

Here, no stay is appropriate. As in other cases, the government cannot release the nearly identical records under Exemption 4 and then go back and reverse course to

seemingly protect federal contractors from embarrassment. Its claim that the pending case changes the circumstances appears dubious, as no actual change in law has occurred and public policy favors maximum disclosure. In any event, *Argus Leader* is irrelevant because under no circumstances do the documents fall under the definition of the words "trade secret," "commercial," or "financial" so not only is a stay inappropriate but it appears OFCCP is using the strawman argument as a delay tactic. OFCCP has now chosen since January 2018 (over a year ago) to fail on its obligations and continues to cause delay simply to avoid embarrassment in the marketplace.

### F. Nonetheless OFCCP wrongly withheld the documents in full without disclosing any segregable portions.

Although the agency seeks to withhold documents based upon Exemption 4 "it must nonetheless disclose all reasonably segregable, nonexempt portions of the requested record(s)." *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1167 (D.C. Cir. 2011); (citing *Oglesby v. U.S. Dep't of the Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996)); see also 5 U.S.C. § 552(b). The agency bears the burden of demonstrating that withheld documents contain no reasonably segregable factual information. *Mokhiber v. U.S. Dept. of Treasury*, 335 F. Supp. 2d 65, 69 (D.D.C. 2004).

Here, OFCCP did not fulfill its burden or obligation. OFCCP merely cited an exemption that the companies used to justify withholding. It showed no evidence of making a separate determination other than deferring to each company's judgment. It is meaningful that OFCCP agreed with all of the companies that chose to withhold *as well as* all of the companies that chose to release the information. For sake of argument, even to the extent that exemption applies, OFCCP disclosed no segregable portions, showing further proof that it made no separate assessment and a failure to provide *unredacted* records. Where an agency has not provided the documents in good faith but instead completely withheld records, courts usually find an exemption was improperly applied.

## IV. Conclusion

In conclusion, OFCCP should release all relevant information immediately. Should OFCCP need clarification as to any aspect of the Request, it may reach me at vbaranetsky@revealnews.org or (510) 982-2890. We look forward to your response within the statutory time period.

Sincerely,

Victoria D. Baranetsky
General Counsel
The Center for Investigative Reporting
cc: Will Evans

1400 65th, Suite 200 Emeryville, CA 94608
PHONE 510 809 3160   TWITTER @CIRonline
WEB cironline.org