# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AMERICAN SMALL BUSINESS LEAGUE,

    Plaintiff,

v.

UNITED STATES DEPARTMENT OF DEFENSE and UNITED STATES DEPARTMENT OF JUSTICE,

    Defendants,

  and

LOCKHEED MARTIN CORPORATION,

    Defendant-Intervenor.

No. C 18-01979 WHA

**ORDER ON JOINT MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this FOIA action, defendants and intervenor move for summary judgment. For the reasons stated below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## STATEMENT

A prior order dated March 8 has set forth the detailed background of this action (Dkt. No. 58). In brief, plaintiff American Small Business League, a non-profit organization that promotes the interests of small businesses, seeks the release of various documents related to defendant United States Department of Defense's Comprehensive Subcontracting Plan Test

1  Program ("Test Program"). This program, which Congress authorized in 1990 in an effort to
2  increase subcontracting opportunities for small businesses, allows prime contractors to submit a
3  single annual "comprehensive subcontracting plan" to identify all subcontract amounts awarded
4  to small businesses on government contracts. Participation in the Test Program is voluntary
5  (Dkt. No. 107-1 ¶¶ 4–5, 8).

6      The Defense Contract Management Agency ("DCMA") manages the Test Program for
7  the DOD. It conducts an annual review, known as the "640 compliance review," of each
8  contractor's compliance with policy requirements and performance with respect to its approved
9  comprehensive subcontracting plan (*id*. ¶¶ 9–10). This review includes narrative descriptions
10 and an overall adjectival rating (*i.e.*, exceptional, satisfactory, good, marginal, or unsatisfactory)
11 (*id*. ¶ 10).

12     Herein, the DOD, defendant Department of Justice, and defendant-intervenor Lockheed
13 Martin Corporation (collectively, "defendants") seek to withhold approximately 2,000 pages of
14 details related to defense contractors Lockheed, Sikorsky Aircraft Corporation, and GE
15 Aviation System's small business subcontracting relationships, strategies, and goals. This
16 withholding is based on Exemption 4 of the FOIA, 5 U.S.C. § 552(b)(4) (Dkt. No. 107 at 7–8).
17 Specifically, the documents at issue are as follows (Dkt. Nos. 20 ¶ 21):

> All documents transmitted between (a) D[O]D or the Department of Justice and (b) Lockheed Martin Corp. ('LM,' including Sikorsky Aircraft Corp. ('Sikorsky') and other LM subsidiaries concerning: (1) the FOIA request dated August 9, 2013, from the American Small Business League ('ASBL') to D[O]D, (2) ASBL") [*sic*], (3) Lloyd Chapman, (4) the CSPTP [(Comprehensive Subcontracting Plan Test Program)], (5) SBIR [(Small Business Innovation Research)], and (6) Mentor-Protégé program.

Additionally, plaintiff seeks GE's comprehensive subcontracting plan for the 2014 fiscal year (Dkt. No. 20 ¶ 14).

    Exemption 4 excepts from disclosure, as relevant here, "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Our court of appeals has held that "[i]nformation qualifies as 'confidential' for the purposes of Exemption 4 if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause

2

1  substantial harm to the competitive position of the person from whom the information was
2  obtained." *GC Micro Corp. v. Def. Logistics Agency*, 33 F.3d 1109, 1112 (9th Cir. 1994),
3  *overruled on other grounds by Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d
4  987 (9th Cir. 2016). Under the then-standard for Exemption 4, the prior order herein dated
5  March 8 on the parties' cross-motions for summary judgment found that issues of fact as to
6  whether disclosure would cause substantial competitive harm precluded summary judgment
7  (Dkt. No. 58 at 9–11). An order dated April 9 set the bench trial date on the Exemption 4 issue
8  for December 9 (Dkt. No. 61 at 2).

9  On June 24, however, the Supreme Court altered the standard for Exemption 4 in *Food
10 Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019), by rejecting the
11 "competitive harm" test. In light of the new standard under *Food Marketing*, defendants have
12 moved again for summary judgment on the Exemption 4 issue (Dkt. No. 107). A prior order
13 dated September 15 granted plaintiff's request to continue the hearing on defendants' summary
14 judgment motion under Rule 56(d) in order to allow plaintiff to take up to three depositions
15 (Dkt. No. 126). This order follows full briefing, including supplemental briefing following
16 plaintiff's requested discovery, oral argument, and an *in camera* review of documents selected
17 by the parties.

18 **ANALYSIS**

19 Summary judgment is appropriate where "the movant shows that there is no genuine
20 dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.
21 R. Civ. P. 56(a). "Most FOIA cases are resolved by the district court on summary judgment,
22 with the district court entering judgment as a matter of law." *Animal Legal Def. Fund v. Food
23 & Drug Admin.*, 836 F.3d 987, 989 (9th Cir. 2016) (en banc).

24 FOIA's purpose is to let us see what our government has been up to by "provid[ing]
25 public access to official information 'shielded unnecessarily' from public view and
26 establish[ing] a 'judicially enforceable public right to secure such information from possibly
27 unwilling official hands.' " *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009)
28 (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). Such access "ensure[s] an

3

informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). FOIA thus "mandates a policy of broad disclosure of government documents." *Maricopa Audubon Soc. v. U.S. Forest Serv.*, 108 F.3d 1082, 1085 (9th Cir. 1997) (quoting *Church of Scientology v. Dep't of the Army*, 611 F.2d 738, 741 (9th Cir. 1979) (internal quotations omitted)).

An agency may withhold a document "only if the material at issue falls within one of the nine statutory exemptions." *Ibid*. These exemptions are "explicitly exclusive and must be narrowly construed in light of FOIA's dominant objective of disclosure, not secrecy." *Ibid*. (internal quotation marks and citations omitted). Because of FOIA's strong presumption in favor of disclosure, the government bears the burden of proving that the information it seeks to shield properly falls within an exemption. *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 772 (9th Cir. 2015). It must further provide all "reasonably segregable" portions of that record to the requester. 5 U.S.C. § 552(b).

The issue here is whether the information Lockheed and Sikorsky seek to withhold is "confidential" within the meaning of Exemption 4. In rejecting the "substantial competitive harm" requirement, the Supreme Court observed that the ordinary meaning of the term "confidential" "suggest[ed] two conditions that might be required for information communicated to another to be considered confidential." *Food Marketing*, 139 S. Ct. at 2363. "In one sense," the term at least had to require the information at issue to be "customarily kept private, or at least closely held, by the person imparting it." *Ibid*. "In another sense, information might be considered confidential only if the party receiving it provides some assurance that it will remain secret." *Ibid*. That is, once shared with the government, the information might *lose* its confidential quality without the government's assurance of privacy. In *Food Marketing*, however, there was "no need to resolve" whether or not the second condition was required, as the information's owner there "clearly satisf[ied] th[at] condition too." *Ibid*. It thus remains an open question as to whether the second showing is required.

4

1	Ultimately, the Supreme Court held that "[a]t least where commercial or financial
2	information is both customarily and actually treated as private by its owner and provided to the
3	government under an assurance of privacy, the information is 'confidential' within the meaning
4	of Exemption 4." *Id.* 139 S. Ct. at 2366.

5	Defendants argue that the requested documents at issue in the instant motion are
6	"confidential" because they contain commercial information that the companies customarily
7	and actually treated as confidential, which they allegedly shared with the DOD under the
8	implied assurance of privacy. On the current record, this order must agree to the extent stated
9	below.[1]

### 1. CUSTOMARILY AND ACTUALLY TREATED AS PRIVATE.

Defendants first contend that the information at issue is exempt from disclosure because the owners of the information "customarily do not disclose" the information "or make it publicly available 'in any way' " and "only small groups of employees usually have access to" the information even within the company (Dkt. No. 107 at 11 (quoting *Food Marketing*, 139 S. Ct. at 2363)).

The "bulk" of documents defendants seek to withhold are the companies' comprehensive subcontracting plans, program reports, and related correspondence (Dkt. No. 107 at 12). Defendants assert that these documents included "granular details" about the companies' "targeted small-business focused initiatives, goals broken out by program level, and the names of [their] suppliers and partners on strategic initiatives" (*ibid.*).

As an initial matter, only information originating from the companies themselves can be considered information that they customarily and actually treated as private during their ordinary course of business. In the instant action, that means that *government assessments and evaluations cannot be considered "confidential" information* for purposes of Exemption 4. This includes, for example, the government's evaluations of a contractor's compliance with regulatory requirements, ratings, assessments of a contractor report's accuracy, and

---

[1] Because plaintiff failed to address defendants' arguments regarding GE's requested information in its opposition or supplemental briefing, defendants' motion to as to GE — namely, the withholding of GE's 2014 comprehensive subcontracting plan under Exemption 4 — is **GRANTED**.

5

1  recommendations — *e.g.*, a finding that an SSR report was "considered not accurate" (*e.g.*,
2  MSJ002082); that a company's suppliers were "not validating their size at time of award" (*e.g.*,
3  *ibid.*); that an "SB goal" was "[n]ot met" because that company "failed to meet the SB goal by"
4  a certain percentage (*e.g.*, MSJ002087); and that the rating of a review was "[e]xceptional"
5  (*e.g.*, MSJ000743). Such information *stemmed from the government*, not the companies. No
6  one can reasonably argue that those evaluations by the government constituted information that
7  belonged to the companies rather than the government. The information generated by the
8  government must be disclosed.[2]

9  On the other hand, information originating from the *companies* may qualify as
10 "confidential" information under *Food Marketing*. Relevant here, the comprehensive
11 subcontracting plans Lockheed and Sikorsky annually submitted to the government contained
12 the companies' small-business subcontracting goals, in terms of percentage categories and
13 actual dollars spent, for that particular year (Dkt. No. 107-5 ¶ 27). The plans also contained
14 information related to the companies' use of small-business subcontractors, including their
15 small-business subcontracting policies and their initiatives for improving small-business
16 subcontracting performance (*id*. ¶¶ 27, 30–32, 37). Because the Test Program required
17 participants to monitor and report on their subcontract awards, Lockheed and Sikorksy also
18 submitted reports — including summary subcontract reports, quarterly reports, and mentor-
19 protégé semiannual reports — to the government. These reports comprised of information
20 about "relevant point(s) of contact for the contractor submitting the report, programs covered
21 under its plan(s), associated subcontract award data, what spend the contractor has expended
22 with each small business concern category for the reporting period in question, detailed
23 progress on initiatives, and suppliers' names and contracts awarded and amounts" (Dkt. No.
24 107-3 ¶ 27; 107-5 ¶ 42). These submissions also involved communications between the
25 companies and the DOD. That is, between the time the companies submitted their initial and
26 final comprehensive subcontracting plan, they corresponded with the DCMA about their

---

[2] This order notes that the DOD recently notified Lockheed of its intent to release the government's adjectival ratings of Lockheed's annual performance regarding small business subcontracting (Dkt. No. 152 at 1). The DOD shall further comport with the findings of this order for all documents at issue.

6

1 specific subcontracting program (and their performance thereon) and negotiation meetings with
2 the DCMA (Dkt. No. 107-5 ¶ 58).

3       The withheld Lockheed and Sikorsky documents further included material (and related
4 correspondence) the companies submitted to the DCMA for the 640 compliance review —
5 including purchase orders, individual subcontracting reports, and dollar spend reports for all
6 supplier categories — to demonstrate their compliance with the governing regulations and
7 performance against their commitments identified in their comprehensive subcontracting plan
8 (Dkt. Nos. 107-3 ¶¶ 33–34; 107-5 ¶¶ 46–47, 51–53). The DCMA reviews themselves also
9 contained said information provided by the companies in its bare form.

10       Both Lockheed and Sikorsky swear that they customarily and actually kept all of the
11 aforementioned commercial information within the withheld documents confidential in the
12 ordinary course of business because, for example, competitors would "obtain substantial
13 insights into the specific [Lockheed] business unit with whom they compete on major contract
14 awards" (*e.g.*, Dkt. Nos. 107-3 ¶¶ 23, 35–37; 107-5 ¶¶ 38, 47, 53). They used various methods
15 to protect the information, such as (1) requiring employees and business partners to enter into
16 confidentiality agreements; (2) using restrictive markings on documents and communications;
17 (3) using secure, password-protected IT networks for the information at issue; and/or (4)
18 limiting access to the information at issue on a "need to know" basis (Dkt. Nos. 107-3 ¶ 11;
19 107-5 ¶ 28). When submitting the comprehensive subcontracting plans or reports, for example,
20 the companies marked them with "restrictive legends identifying the information contained
21 therein as proprietary and confidential" (Dkt. Nos. 107-3 ¶¶ 17, 26; 107-5 ¶ 28). Lockheed kept
22 all documents related to the 640 audits on SharePoint, a protected site only accessible to its
23 supplier diversity leadership (Dkt. No. 107-5 ¶ 48). Defendants further point to the fact that
24 these various protective measures "have proven effective in preventing the information . . . from
25 becoming publicly available . . . anywhere outside" of the companies, as they are "not aware" of
26 the public availability of any of the information at issue (*id.* ¶ 22).

27       And, plaintiff does not offer evidence, with respect to most of the aforementioned
28 information, to create a genuine issue of fact as to the information's confidentiality. Even after

7

1  granting additional discovery under Rule 56(d), the most plaintiff points to are the press
2  releases in which Lockheed selectively disclosed the performance of their top small business
3  suppliers, a fact already known before discovery (Dkt. No. 113 at 9–13).  That is, Lockheed has
4  issued various press releases when it received the "highest possible rating" for its performance
5  (including a list of its "exemplary" small business suppliers), even though it asserts that it
6  customarily keeps information about its suppliers confidential "because it could be used by
7  competitors to target and award work to [Lockheed] suppliers, thereby making them
8  unavailable, or less available, to work on [Lockheed] contracts" (Dkt. No. 107-5 ¶ 53).  Further
9  discovery granted under Rule 56(d) into the issue of selective disclosure of this high level
10 information about the companies' suppliers and ratings as well as plaintiff's own expert
11 declarations, however, do not sufficiently undermine defendants' declarations or raise a triable
12 issue of fact as to the rest of the details within the documents at issue.[3]  Nor is the fact that
13 Lockheed maintained a public "Supplier Wire" website, which included high-level information
14 on the types of goods and services it sought from subcontractors, or Lockheed's participation in
15 trade shows, sufficient to raise a factual issue (*see* Dkt. No.141 at 2–3).

16   Plaintiff's reliance on *Maricopa* for the proposition that FOIA does not allow selective
17 disclosure of certain information is unpersuasive, as that case involved selective disclosure of
18 the information to only certain *parties*.  108 F.3d at 1088.  *Maricopa* thus stands for the
19 unremarkable notion the same information disclosed to one requester must be disclosed to all
20 requesters of that information.  At bottom, plaintiff simply has not pointed to particular facts
21 demonstrating that the specific information within the over 2,000 pages it seeks, in all its
22 granularity — including information related to how the companies intend to meet their
23 subcontracting goals, which industries they plan to target and their strategy for such targeting,

---

[3] To reiterate, however, the ratings are not "confidential" information for the separate reason that they are the government's information, not the companies'.  Thus although plaintiff's showing of the companies' press releases by itself is not sufficient to raise a triable issue of fact, all ratings must still be disclosed.

8

1  and their planned initiatives for promoting use of small businesses — was not customarily and
2  actually kept private by the companies.[4]

3  The Court is sympathetic to plaintiff's steep uphill battle under the new Exemption 4
4  standard. Under *Food Marketing*, it appears that defendants need merely invoke the magic
5  words — "customarily and actually kept confidential" — to prevail. And, unless plaintiff can
6  show that the information is in fact publicly available or possibly point to other competitors
7  who release the information, defendants can readily ward off disclosure. As the dissent in *Food*
8  *Marketing* points out, the result seems "at odds with" FOIA's purpose, which is "to give the
9  public access to information it cannot otherwise obtain." *Food Mktg.*, 139 S. Ct. at 2368
10 (Breyer, J., dissenting). "After all, where information is already publicly available, people do
11 not submit FOIA requests — they use Google." *Ibid*. And, the undersigned judge has learned
12 in twenty-five years of practice and twenty years as a judge how prolifically companies claim
13 confidentiality, including over documents that, once scrutinized, contain standard fare blather
14 and even publicly available information. Nevertheless, we are not writing on a clean slate.
15 *Food Marketing* mandates this result.

16 **2.    ASSURANCE OF PRIVACY.**

17 Defendants next argue that, insofar as *Food Marketing Institute* requires a showing that
18 the government gave an assurance of privacy, they did so where DOD personnel "gave explicit
19 assurances to the companies, and the companies relied on those statements" (Dkt. No. 107 at 2).
20 Moreover, "an implied assurance of privacy arose from a number of factors, including the
21 purpose and nature of the Test Program, regulations regarding pre-disclosure notification, and
22 the anonymized manner in which a narrow subset of this information is provided annually to
23 Congress," they say (*ibid.*). Assuming without deciding that the "assurance of privacy"

---

[4] Plaintiff claims that Lockheed "admitted" its "goals for small business subcontracting are not kept confidential, and that its corporate historical subcontracting performance has been released" (Dkt. No. 141 at 2 (citing Raheb Dep. at 65:1–21, 250:5–252:10)). This claim, however, is based on a subcontracting plan released in the instant case under the prior "competitive harm" standard for Exemption 4. This is insufficient to show that Lockheed did not customarily and actually keep that information confidential in the ordinary course of business.

9

1  requirement applies here, this order finds that defendants have sufficiently shown that the
2  government made an implied assurance.

3  *First*, Nancy Deskins, a former Lockheed employee who was asked beginning in 2007
4  to review and respond to the DCMA's requests to provide more details in Lockheed's small
5  business subcontracting plans, states that she is "personally aware of the assurances DOD and
6  DCMA gave" to Lockheed, "namely, that the agencies would treat [its] proprietary information
7  as confidential" (Dkt. No. 107-4 ¶ 4). Initially, Lockheed "had concerns and raised questions to
8  DCMA regarding its commitment to treat [Lockheed's] programs, contracts, and supplier
9  information as confidential, and DCMA's willingness to provide appropriate protections to
10 such" information and thus reported "only at a very high level" (*id*. ¶ 11). Over time, the
11 DCMA continued to request more detailed subcontracting information and eventually audited
12 Lockheed (*id*. ¶ 12). Lockheed ultimately "acquiesced to DCMA's wishes" and submitted a
13 single, comprehensive plan with the additional information (*id*. ¶ 14). Deskins states that
14 Lockheed's decision "was premised on the numerous meetings and discussions with DCMA,
15 during which DCMA assured [Lockheed] that [Lockheed]'s proprietary and confidential
16 information related to its small business subcontracting plan would be treated as confidential"
17 and that Lockheed's "continued participation in the Test Program, and specifically its provision
18 of information as part of the program, is premised upon the initial assurances DCMA provided
19 about keeping [Lockheed's] information confidential" (*id*. ¶¶ 14, 16; Dkt. No. 107-5 ¶ 13).

20 *Second*, as defendants point out, the "pattern and practice of behavior on the part of both
21 [the companies] and the [g]overnment for the duration of the Test Program" further evidence an
22 implied assurance of privacy (Dkt. No. 107-5 ¶ 14). For example, the government created a
23 secure portal called AMRDEC Safe Access File Exchange (and other similar systems) to
24 facilitate Lockheed's transfer of large files containing its subcontracting plan information,
25 negotiation communications, and documentation (*id.* ¶ 16). The government received
26 documents from the companies with restrictive markings of confidentiality without ever
27 suggesting anything to the contrary. The 640 audits were held in secured facilities with limited
28

10

access. The DCMA destroyed all documents submitted by Lockheed at the conclusion of each audit (Dkt. No. 107-5 ¶ 48).

*Third*, Janice Buffler, a former Associate Director at the DOD Office of Small Business Programs from 2010 to September 2018 who oversaw the Test Program, told the voluntary participants "that the government consider[ed] some of the information it receive[ed] from them to be private and confidential" — specifically, the information in their comprehensive subcontracting plans "related to target industries and initiatives as well as to their accomplishments vis-à-vis the identified milestones was to be treated as confidential" (Dkt. No. 107-1 ¶¶ 1, 14). She states she gave such assurances "because without this level of detail, [the DOD] would not have been able to determine whether or not they were successful in reaching their proposed target industry and initiative goals" (*id*. ¶ 14). The DCMA "understood that the information submitted was sensitive" because it was "essentially a roadmap of each participant's efforts to hire small businesses, and include[d] information about weaknesses at the companies as well as detailed information about subcontractors" (*id*. ¶ 15). She further states that she was "not aware of the government ever indicating to participants that the confidential information they submit[ted] would not be treated as private in accordance with the governing regulations" (*id*. ¶ 14; *see also* Dkt. No. 107-5 ¶ 14). And, the "manner in which the government convey[ed] Test Program information to Congress further indicate[d] to participants that this information [would] be kept private" (*id*. ¶ 18). That is, since 2016, the Secretary of Defense is required to report annually to Congress "on any negotiated [comprehensive subcontracting plan] that the Secretary determines did not meet the subcontracting goals negotiated in the plan for the prior fiscal year" (*ibid*.). "The reports to Congress identif[ied] the participants in the Test Program (including Lockheed Martin, Sikorsky and GE Aviation), but anonymize[d] them when indicating whether they met the socioeconomic goals in their prior fiscal year [comprehensive subcontracting plans]. Those reports to Congress also provided "only the percentage of each goal and percentage achieved, and provide[d] no further information obtained through the Test Program" (*ibid*.). Buffler thus reiterates that the redacted commercial information at issue the companies provided to the DOD related to their

11

relationships with particular subcontracts and their business strategies were "submitted to the government under the assurances of confidentiality" (*id*. ¶ 20).

Plaintiff does not necessarily dispute the facts offered by defendants. Instead, it takes issue with the sufficiency of defendants' declarations, calling them "suspiciously vague about the elements of confidentiality," as they "do not quote specific language in specific documents showing the elements of confidentiality in exchanges of arrangements between the government and contractors" or "quote specific language in specific documents of the elements of confidentiality in government regulations or manuals" (Dkt. No. 113-3 ¶ 6). Plaintiff essentially wants written proof of assurances of privacy, a not unreasonable proposal given how easily the agency could have supplied a letter of assurance in advance. It further discounts Buffler's declaration, as she is now retired, and thus contends that "the government does not provide a single declaration from anyone currently in an official position" (*id*. ¶ 9).

This order, however, does not find that Exemption 4 requires such written documentation or express assurances by the government. An implied assurance suffices. The Supreme Court in *Food Marketing* noted approvingly an early decision by our court of appeals that held that Exemption 4 "protect[s] information that a private individual wishes to keep confidential for his own purposes, but reveals to the government under the express or *implied* promise of confidentiality." 139 S. Ct. at 2363 (quoting *GSA v. Benson*, 415 F.2d 878, 881 (9th Cir. 1969)) (internal quotation marks omitted) (emphasis added). It further looked to "the similar phrase 'information furnished by a confidential source' in FOIA Exemption 7(D)." *Id*. at 2363–64 (citing *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 173–174 (1993)). In *Landano*, the Supreme Court noted that "an implied assurance of confidentiality" may be reasonably inferred based on certain "generic circumstances." 508 U.S. at 179. There, the Supreme Court analyzed the evidentiary showing required to establish that sources providing information to the FBI in the course of a criminal investigation were "confidential" sources within the meaning of Exemption 7(D). *Id*. at 167. It opined that "it [was] reasonable to infer that paid informants normally expect[ed] their cooperation with the FBI to be kept confidential." *Id*. at 179. And, the "nature of the informant's ongoing relationship with" the

12

1  FBI, the fact that the FBI "typically communicate[d] with informants only at locations and
2  under conditions which assure[d] the contact w[ould] not be noticed," and the "character of the
3  crime at issue" in that case "justif[ied] the inference." *Ibid*. (internal quotation marks omitted).
4  So too here. Such inference of assurance is reasonable where, as discussed above, the
5  context involved Lockheed and Sikorsky's voluntary participation in the Test Program and the
6  DOD's increasing requests for more detailed commercial information. The government
7  provided secure portals to transmit documents. The companies placed restrictive markings on
8  their submissions. Over the many years of the companies' participation in the Test Program,
9  there is no evidence that the government ever suggested that it would not treat the companies'
10 information confidentially. The DOD understood the companies' confidential treatment of the
11 information at issue. It anonymized the relevant information in public settings, such as during
12 congressional hearings. These nonexhaustive examples sufficiently show that the companies
13 provided the documents at issue under the implied assurance of privacy by the government.

### 3. FOIA IMPROVEMENT ACT OF 2016.

In 2016, Congress amended FOIA to add a "foreseeable harm" requirement, under which agencies "shall withhold information" under the FOIA "only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption" or "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i); FOIA Improvement Act of 2016, Pub. L. No. 114–185, 130 Stat. 538, 539 (2016). In other words, even if an exemption applies, an agency must release a record if disclosure would not reasonably harm that exemption-protected interest — given its age, content, and character — and its disclosure is not prohibited by law. The "foreseeable harm" standard applies here, where plaintiff requested the documents at issue after the date of enactment (June 30, 2016). Pub. L. No. 114–185, § 6, 130 Stat. 538, 545.

Plaintiff and amicus point to the 2016 FOIA amendment to effectively reinstate the competitive harm test for Exemption 4. Amicus argues that, based on FOIA's legislative history, agencies must show that disclosure would cause foreseeable competitive harm (Dkt. No. 116-1 at 8). Amazingly, it points to *National Parks & Conservation Association v. Morton*, 498 F.2d 765, 768 (D.C. Cir. 1974) — the very decision the Supreme Court in *Food Marketing*

13

1 overruled — which identified the "protect[ion of] persons who submit financial or commercial
2 data to government agencies from the competitive disadvantages which would result from its
3 publication" as one of Exemption 4's purpose (*ibid*.). But the Supreme Court expressly
4 discredited that notion for defining Exemption 4, as the United States Court of Appeals for the
5 District of Columbia in *National Parks* "relied heavily on statements from witnesses in
6 congressional hearings years earlier on a different bill that was never enacted into law." *Food
7 Food Mktg*, 139 S. Ct. at 2364.

8 Ultimately, under *Food Marketing*, the plain and ordinary meaning of Exemption 4
9 indicates that the relevant protected interest is that of the information's *confidentiality* — that is,
10 its private nature. Disclosure would necessarily destroy the private nature of the information,
11 no matter the circumstance. This order may not use the FOIA amendment to circumvent the
12 Supreme Court's rejection of *National Parks's* reliance on the legislative history in determining
13 the scope of the term "confidential."

14 Plaintiff and amicus essentially rely on "a policy argument about the benefits of broad
15 disclosure." *Id*. at 2366. But as the Supreme Court pointed out, "FOIA expressly recognizes
16 that 'important interests are served by its exemptions.' " *Ibid*. (quoting *FBI v. Abramson*, 456
17 U.S. 615, 630–31 (1982)) (alterations omitted). And, "those exemptions are as much a part of
18 FOIA's purposes and policies as the statute's disclosure requirement." *Ibid*. (quoting *Encino
19 Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)) (alterations omitted). Relevant here,
20 Congress has already determined "a 'workable balance' between disclosure and other
21 governmental interests," which interests "may include providing private parties with sufficient
22 assurances about the treatment of their proprietary information so they will cooperate in federal
23 programs and supply the government with information vital to its work." *Ibid*. (citing *Milner v.
24 Dep't of Navy*, 562 U.S. 562, 589 (2011) (Breyer, J., dissenting)).[5]

---

[5] Because the FOIA Improvement Act of 2016 did not apply to the information sought in *Food Marketing*, the Supreme Court did not address its impact on Exemption 4.

14

### 4. SEGREGABILITY.

"Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b); *see also id*. § 552(a)(8)(A)(ii)(II) ("An agency shall . . . take reasonable steps necessary to segregate and release nonexempt information."). To this end, an agency must "provide the court with its *reasons —* as opposed to its simple conclusion — for its inability to segregate non-exempt portions of the documents, and also to provide the court with a description of what proportion of the information in a document is non-exempt, and how that material is dispersed throughout the document." *Asian Law Caucus v. U.S. Dep't of Homeland Sec.*, No. C 08-00842 CW, 2008 WL 5047839, at *6 (N.D. Cal. Nov. 24, 2008) (Judge Claudia Wilken) (quoting *Lawyers' Comm. for Civil Rights of San Francisco Area v. Dep't of the Treasury*, No. 07-2590 PJH, 2008 WL 4482855, at *14 (N.D. Cal. Sept. 30, 2008) (Judge Phyllis Hamilton)) (internal quotation marks omitted). It is not, however, required "to commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 n.55 (D.C. Cir. 1977).

Here, defendants have withheld twelve documents in full, arguing that those documents contained "a *de minimis* amount of public information," such as "general statements briefly describing product lines or small business suppliers," "that is inextricably intertwined within the exempt information" (*ibid*.; Dkt. No. 122 at 9). They thus contend that the information is not reasonably segregable.

Defendants do not, however, offer any evidence in the record, such as a declaration or deposition testimony, to support this conclusory assertion of *de minimis*, inextricably intertwined non-exempt information for these twelve documents. And, the Court's *in camera* review of the thirty documents selected by plaintiff, Lockheed, and Sikorsky confirms that such information is not *de minimis* or inextricably intertwined with exempt material — particularly in light of the ruling above that information originating from the government is not

15

"confidential" within the meaning of Exemption 4. Defendants therefore must release redacted versions of those twelve documents currently withheld in full.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Defendants must release updated redacted versions of *all* documents (2,000-plus pages) at issue — including the disclosure of all government evaluations and assessments — by **JANUARY 6, 2020**. The bench trial scheduled for December 9 is hereby **VACATED**.

**IT IS SO ORDERED.**

Dated: November 24, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE