UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF LABOR, <br><br> Defendant. | Case No. 4:19-cv-01843-KAW <br><br> **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. Nos. 24, 29 |

On August 23, 2019, the U.S. Department of Labor filed a motion for summary judgment on the grounds that the Government was justified in withholding documents under the Freedom of Information Act's Exemption 4. On September 30, 2019, Plaintiffs, The Center for Investigative Reporting and Will Evans, filed a cross-motion for summary judgment.

On December 5, 2019, the Court held a hearing, and after careful consideration of the parties' arguments and the applicable legal authority, for the reasons set forth below, DENIES Defendant's motion for summary judgment, and GRANTS Plaintiffs' cross-motion for summary judgment.

## I. BACKGROUND

Plaintiff the Center for Investigative Reporting ("CIR") is a nonprofit, investigative news organization that publishes *Reveal*, an online news site, and has a weekly public radio show with approximately one million listeners per week. (Compl., Dkt. No. 1 ¶ 13.) Plaintiff, Will Evans, is a staff reporter for *Reveal* and an employee of CIR. (Compl. ¶ 14.) Defendant U.S. Department of Labor ("DOL") oversees the Office of Federal Contract Compliance Programs ("OFCCP"). (Compl. ¶ 15.)

On January 4, 2018, Plaintiffs submitted a Freedom of Information Act ("FOIA") request

to DOL's OFCCP seeking disclosure of federal contractors' employment diversity reports (known as EEO-1 reports). (*See* Compl. ¶ 2; Decl. of D. Lissette Geán, "Geán Decl.," Dkt. No. 24-11 at ¶ 13, Ex. 1.) The request explicitly sought the 2016 EEO-1 Consolidated Report (Type 2) for 55 named companies. (Geán Decl. ¶ 13.)

Companies with 50 or more employees that contract with the federal government must submit annual reports using Standard Form 100, commonly known as "EEO-1 report," to the Joint Reporting Committee ("JRC"). 41 C.F.R. § 60-1.7(a). Companies that do business at two or more physical addresses (i.e. establishments) must file an EEO-1 Consolidated Report (Type 2) to that web portal. U.S. EQUAL EMP'T OPPORTUNITY COMM'N, Fact Sheet for EEO-1 Survey Filers, https://www.eeoc.gov/employers/eeo1survey/fact_sheet_filers.cfm (last visited Dec. 4, 2019). EEO-1 Type 2 reports require companies to report the total number of employees across all their establishments by race/ethnicity, gender, and job category. U.S. EQUAL EMP'T OPPORTUNITY COMM'N, Memorandum from EEO-1 Joint Reporting Committee on Computer Printed EEO-1 Reports- Required Format (Rev 3/2007) to Multi-establishment Private Employers (July 2007), https://www.eeoc.gov/employers/eeo1survey/upload/compfiling-multi.pdf (last visited Dec. 4, 2019). These reports help OFCCP monitor the contracting companies' compliance with Executive Order No. 11,246 which prohibits employment discrimination by government contractors. (Geán Decl. ¶ 5.)

The Equal Employment Opportunity Commission ("EEOC") collects similar data for employers with 100 or more employees. (Geán Decl. ¶ 8.) To avoid duplication of efforts and reduce the administrative burden on companies, EEOC and OFCCP formed the JRC to administer the EEO-1 reporting system in a manner that establishes a single data collection to meet the statistical needs of both agencies. *See id.* The JRC web portal is managed by the EEOC, which collects the information and shares with OFCCP the reports from the companies subject to the OFCCP's jurisdiction. (Geán Decl. ¶ 9.)

On March 13, 2018, then-Special Assistant to the Deputy Director, D. Lissette Geán, informed Plaintiffs that OFCCP identified only 36 of the named 55 companies as federal

contractors subject to OFCCP's jurisdiction. (Geán Decl. ¶ 15, Ex. 3.)[1] On March 14, 2018, Ms. Geán, notified those 36 federal contractors of the plaintiffs' FOIA request for their EEO-1, Type 2 information. (Geán Decl. ¶ 16.) The notice was sent out pursuant to the notice requirement for confidential commercial information as described in DOL's duly promulgated regulation, 29 C.F.R. § 70.26. (Geán Decl. ¶ 16.) The letters informed the companies that they had 30 days from receipt of the letter to object in writing, and that their failure to respond would result in the release of their EEO-1, Type 2 data to Plaintiffs. (Geán Decl. ¶¶ 17-19, Ex. 4.)

On April 18, 2018, Ms. Geán sent a second notice to submitters who had not objected within the initial 30 days. (Geán Decl. ¶ 20, Ex. 5.) The April 18, 2018 letters referenced the March 14, 2018 letters, and informed those submitters that if they failed to object by close of business on May 31, 2018, their EEO-1 Type 2 data will be released to the plaintiff-requesters. (Geán Decl. ¶ 21, Ex. 5.) Also on April 18, 2018, Ms. Geán separately informed Plaintiffs that, as of the date of that letter, 14 of the 36 companies objected to the release of their data on the grounds of FOIA Exemption 4. (Geán Decl. ¶ 22, Ex. 6.)

By May 31, 2018, a total of 20 of the 36 companies submitted written objections to DOL. (Geán Decl. ¶ 23.) On April 18, 2018 and on July 5, 2018, DOL sent each of the 20 objecting submitters a letter informing them that DOL "concurred with their assertions that their EEO-1 reports were exempt from mandatory disclosure pursuant to Exemption 4 of FOIA." (Geán Decl. ¶ 24, Ex. 7.) As such, DOL informed these objectors that it would not release their EEO-1 Type 2 data to Plaintiffs. *Ids.*

On August 14, 2018, Ms. Geán, sent a letter to Plaintiffs confirming that one of companies in the original FOIA request, Trimble Navigation, had been removed from the request. (Geán Decl. ¶ 25, Ex. 8.) In addition, by the date of the letter, Ms. Geán informed Plaintiffs that 15 submitters had not objected to the release of their EEO-1 Type 2 data. (Geán Decl. ¶ 26.) Subsequently, on August 16, 2018, via e-mail, OFCCP released the EEO-1 Type 2 data for those

---

[1] The Court finds that the declaration makes a sufficient showing that DOL performed a proper search to identify those companies that were currently federal contractors, so the Court will not address Plaintiffs argument that a proper search was not performed.

3

1   15 submitters who failed to timely object to the release of their EEO-1 data by May 31, 2018.

2   (Geán Decl. ¶ 27, Ex. 9.)

On February 22, 2019, OFCCP informed Plaintiffs that it would delay issuing a final response to this FOIA request pending the outcome of the Supreme Court decision in *Argus Leader*. (Geán Decl. ¶ 28, Ex. 10.)

On March 1, 2019, Plaintiffs submitted an administrative appeal pursuant to 29 C.F.R. § 70. (Geán Decl. ¶ 29, Ex. 11.) On March 21, 2019, DOL acknowledged receipt of the appeal. (Geán Decl. ¶ 30.)

On April 9, 2019, Plaintiffs filed this action. After the case was filed, additional companies decided to release the information. (Geán Decl. ¶ 32.) As a result, the pending motions only pertains to DOL's decision to withhold the EEO-1 Type 2 data for the following companies: Xilinx, Applied Materials, Inc., Equinix, Gilead Sciences, Inc., Synopsys, Inc., Docusign, Inc., Agilent Technologies, Box, and Oracle America, Inc., and Fitbit, Inc. (Def.'s Mot. at 6.)

On August 23, 2019, Defendant filed a motion for summary judgment. (Def.'s Mot., Dkt. No. 24.) On September 30, 2019, Plaintiffs filed an opposition to the motion for summary judgment and cross-motion for summary judgment. (Pls.' Opp'n, Dkt. No. 29.) Also on September 30, 2019, the Reporters Committee for Freedom of the Press filed an amicus curiae brief. (Amicus Br., Dkt. No. 28-1.) On October 28, 2019, Defendant filed an opposition to the cross-motion and a reply in support of its motion for summary judgment. (Def.'s Reply, Dkt. No. 34.) On November 12, 2019, Plaintiffs filed a surreply to Defendant's motion for summary judgment and a reply in support of the cross-motion. (Pl.'s Surreply, Dkt. No. 35.)

## II. LEGAL STANDARD

### A. The Freedom of Information Act ("FOIA")

"Congress enacted FOIA to overhaul the public-disclosure section of the Administrative Procedure Act (APA). . . ." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). The intent behind the FOIA was to "clos[e] the loopholes which allow agencies to deny legitimate information to the public." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 150 (1989) (citations and quotations omitted). Its purpose was to "ensure an informed citizenry, vital to the functioning of a

4

democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152, (1989) (citations and quotations omitted). Accordingly, FOIA mandates a "strong presumption in favor of disclosure," with "disclosure, not secrecy, [being its] . . . dominant objective . . . ." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).

"At the same time, the FOIA contemplates that some information can legitimately be kept from the public through the invocation of nine 'exemptions' to disclosure." *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 687 (9th Cir. 2012) (citing 5 U.S.C. § 552(b)(1)-(9)); *see also Tax Analysts*, 492 U.S. at 150-51 (agency must disclose records unless the records may be withheld pursuant to one of the enumerated exemptions listed in § 552(b)); *Lion Raisins, Inc. v. U.S. Dep't of Agriculture*, 354 F.3d 1072, 1079 (9th Cir. 2004) (the FOIA requires full agency disclosure except where specifically exempted).

### B. Motion for Summary judgment

Summary judgment is the proper avenue for resolving a FOIA case. *See, e.g., Nat'l Wildlife Fed'n v. U.S. Forest Service*, 861 F.2d 1114, 1115 (9th Cir. 1988). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To prevail on a motion for summary judgment in a FOIA case, an agency must demonstrate that, drawing all reasonable inferences in the light most favorable to the requester, there is no genuine issue of material fact with regard to the agency's compliance with FOIA, both in terms of conducting a search reasonably calculated to uncover all relevant documents and withholding only those documents or pieces of information that fall within one of the specified exemptions. *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 986 (9th Cir. 2009); *Kamman v. IRS*, 56 F.3d 46, 49 (9th Cir. 1995); *Steinberg v. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994).

### III. DISCUSSION

The instant motion pertains to DOL's decision to withhold ten EEO-1 reports pursuant to FOIA's Exemption 4. (*See* Def.'s Mot. at 6.)

**A. Whether the Diversity Reports are Exempt from Disclosure under Exemption 4.**

"Exemption 4 shields from mandatory disclosure 'commercial or financial information obtained from a person and privileged or confidential.'" *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019) ("*Argus Leader*") (quoting 5 U.S.C. § 552(b)(4)). There is no dispute that the submitting companies constitute persons under FOIA, as the definition includes corporations. 5 U.S.C. § 551(2). Thus, the Court will address whether the information sought is commercial or financial in nature and whether it is privileged or confidential.

**i. Commercial or Financial**

Defendant argues that the documents sought are commercial in nature, because it relates to the contractors' respective business strategies, and could cause financial harm to the companies if the information is released. (*See* Def.'s Mot. at 10.) Plaintiffs argue that the information sought is not commercial or financial, rendering Exemption 4 inapplicable. (Pls.' Opp'n at 12.)

Courts "have consistently held that the terms 'commercial' and 'financial' in the exemption should be given their ordinary meanings." *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983) (citations omitted). Generally, information is deemed commercial if it relates to the commercial activity of a business, but "not every bit of information submitted to the government by a commercial entity qualifies for protection under Exemption 4[.]" *Id.* at 1290; *see also Bd. of Trade of City of Chicago v. Commodity Futures Trading Comm'n,* 627 F.2d 392, 403 n. 78 (D.C. Cir. 1980), abrogated on other grounds by *U. S. Dep't of State v. Washington Post Co.,* 456 U.S. 595, 102 S. Ct. 1957, 72 L. Ed. 2d 358 (1982). Indeed, a list of names and addresses of employees, which the employer was required to submit to the Government, was not considered financial or commercial under Exemption 4. *Getman v. N.L.R.B.,* 450 F.2d 670, 673 (D.C. Cir. 1971).

Here, the EEO-1 reports require federal contractors to furnish the composition of their workforce broken down by gender, race/ethnicity, and general job category. *See* U.S. EQUAL EMP'T OPPORTUNITY COMM'N, Sample EEO-1 Report, https://www.eeoc.gov/employers/eeo1survey/upload/eeo1-2-2.pdf (last visited Dec. 3, 2019). There is no salary information, sales figures, departmental staffing levels, or other identifying

information in these reports. Rather, the diversity reports merely disclose the workforce composition to ensure compliance with Executive Order 11,246, which prohibits employment discrimination by federal contractors.

Even so, the Government contends that the information is "commercial." In support of this assertion, Defendant submitted supporting declarations from several of the objecting submitters. For example, Julie Crane of Applied Materials, contends that the information furnished in the EEO-1 concerns

> its labor strategy, demographics, recruiting, and allocations of resources across its segments. Disclosing the EEO-1 information would provide its competitors insights into its strategy, operations, recruiting, and labor costs, creating substantial competitive harm. This would only grow over time if EEO-1 information were regularly released, as it would allow competitors to discern shifts and strategies for the business going forward, in a highly competitive field.

(Decl. of Julie Crane, "Crane Decl.," Dkt. No. 24-2 at ¶ 6.) Similarly, Kelly Kayser, of Equinix, also stated that Equinix's EEO-1 concerns

> its labor strategy, demographics, recruiting, and allocations of resources across its segments. Disclosing the EEO-1 information would provide its competitors insights into its strategy, operations, recruiting, and labor costs, creating substantial competitive harm. This would only grow over time if EEO-1 information were regularly released, as it would allow competitors to discern shifts and strategies for the business going forward, in a highly competitive field.

(Decl. of Kelly Kayser, "Kayser Decl.," Dkt. No. 24-3 at ¶ 6.) The Court notes that these conclusory declarations have other similarities beyond the verbatim rationale that the requested information are commercial. The Court, however, notes that the EEO-1 form does not ask submitting companies to explain how resources are allocated across a company's "segments." Rather, the report is organized by job category, such as "Professionals," "Sales Workers," "Operatives," "Craft Workers," "Laborers and Helpers," etc. It does not request demographic information by division, department, or "segment." The data sought is companywide.

Another declaration claims that the workforce data provided could make the company vulnerable to having its "diverse talent" poached by its competitors. (Decl. of Tania Barrios, "Barrios Decl.," Dkt. No. 24-1 ¶ 4.) Ms. Barrios attests that, when employees are lured away by other companies, her employer, Xilinx, "lose[s] the talent and experience of the departing

7

employees and it would lose the significant investment it has made in training those employees." *Id.* at 4. Additionally, Xilinx would incur substantial cost in attempting to fill the positions vacated by those departed employees. *Id.* While lost talent costs companies money, there is a significant disconnect between access to workforce composition and poaching "diverse talent." The Court finds the claim that the EEO-1 reports would make it easier for competitors to lure away talent to be dubious, since the job categories are so general. For example, the "Professionals" category includes most jobs that require a bachelors or graduate degree, including "accountants and auditors; airplane pilots and flight engineers; architects; artists; chemists; computer programmers; designers; dieticians; editors; engineers; lawyers; librarians; mathematical scientists; natural scientists; registered nurses; physical scientists; physicians and surgeons; social scientists; teachers; and surveyors." U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEO-1 Survey Fact Sheet for Filers, https://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm (last visited Dec. 4, 2019). Since there is no breakdown by department, the total number of professionals reported not only includes the company's computer programmers and engineers, but also its lawyers and accountants. Moreover, even without access to general demographic information, there is nothing stopping competitors from recruiting highly coveted female and minority employees via headhunters or networking websites, such as LinkedIn or Dice. (*See* Barrios Decl. ¶ 4.) Regardless, concerns regarding poaching go more to the confidentiality element of the exemption than the commercial one.

Without addressing every declaration submitted by the Government, the Court notes that other declarations misrepresent the breadth of information contained in the EEO-1 reports. For example, the declaration of Nancy Lewis-Treolo, Senior Director of HR Operations at Docusign, states that the "EEO-1 report contains highly sensitive commercial information, including the number of its employees, the types of positions they hold, the span of managerial control, and the distribution of those employees within various teams." (Decl. of Nancy Lewis-Treolo, "Lewis Treolo Decl.," Dkt. No. 24-6 at ¶ 6.) As discussed above, the report does not provide information regarding the distribution of employees within various divisions, departments, segments or "teams." Rather, the information sought is general job categories and the data provided is

8

companywide.

In its reply, Defendant cites to *100Reporters LLC v. United States Dep't of Justice*, 248 F. Supp. 3d 115, 137 (D.D.C. 2017), in support of its contention that the demographic information is commercial because "[i]nformation that is instrumental to a commercial interest is sufficiently commercial for the purpose of Exemption 4." (Def.'s Reply at 2.) In *100Reporters*, the court found that the Three Year Work Plan documents were commercial because they "set forth the steps the Monitor planned to take to evaluate Siemens' compliance programs… [and] reflect[ed] 'Siemens' business operations, structure, and compliance controls.'" *Id.* at 137. "For example, the Monitor's first work plan describes 'the number of Siemens employees in each country, new orders, new government orders, joint ventures and business partnerships, and Siemens' business development strategy across different sectors of the economy.'" *Id.* [2] In sum, the documents found to be commercial in *100Reporters* reflect a level of detail not contained in the EEO-1 reports at issue here. Thus, the Government's reliance on *100Reporters* is misplaced.

Finally, the Government argues that "[t]he various job categories as well as the number of people hired in each category contained in the EEO-1, Type 2 reports is instrumental to each submitter's ability to carry out its commercial interests. Businesses cannot engage in commerce without the sufficient personnel in specified job categories, which is thus related to the businesses' commercial enterprise." (Def.'s Reply at 2.) Essentially, the Government is asking the Court find exempt any statistical information pertaining to employees simply because the business is a commercial enterprise. This expansive interpretation has been rejected. *See Getman,* 450 F.2d at 673. At the hearing, the Court asked the Government how the demographic information was

---

[2] The Court notes that, after an *in camera* review to determine segregability, the district court found that most of the documents withheld were not exempt, because they "consist[ed] mostly of general descriptions of the Monitor's past and future activities with very few details about Siemens' business operations." *100Reporters LLC v. United States Dep't of Justice*, 316 F. Supp. 3d 124, 140 (D.D.C. 2018). The district court did, however, find the "Countries of Interest" section, which included "the number of Siemens employees in each country" to be exempt, but that section also included information pertaining to "new orders, new government orders, joint ventures and business partnerships, and Siemens' business development strategy across different sectors of the economy," so it is possible that the labor information was not easily segregated from the commercial information. *See id.* at 141 (internal quotations omitted). Nevertheless, the undersigned is not bound by the district court's decision.

9

commercial, and the Government argued that the information would reveal each submitting company's organization chart, corporate structure, and how it allocates resources. As discussed above, it is impossible to discern a corporation's structure given the EEO-1's general job categories, and the furnished information is companywide rather than by department.

Accordingly, in light of the absence of information pertaining to specific positions or departments, the Court finds that the Government has failed to make a showing that the demographic information contained in the EEO-1 reports is commercial. As a result, the Government was not justified in applying Exemption 4 to the EEO-1 reports, and they must be produced unredacted.

### ii. Confidentiality

Since the information sought is not commercial in nature, the Court need not address whether the information is confidential under *Argus Leader*.

Nonetheless, the Court is not convinced that the information sought would be confidential. In *Argus Leader*, the Supreme Court found that uncontested testimony established that the information was not disclosed, or made "publicly available 'in any way[,]'" suggested that it was confidential. 139 S. Ct. at 2363. To the contrary, here, at least one of the objecting companies, Gilead, published a summary of the EEO-1 data in its annual report, and included a notation that the information was based on the company's 2016 EEO-1 filing. (*See* Suppl. Decl. of D. Lissette Geán, Dkt. No. 34-1 ¶¶ 13-15; Gilead Sciences, 2016 Year in Review report at 24, http://investors.gilead.com/static-files/33588c5a-7f81-437a-b35a-379514d49eff (last visited Dec. 6, 2019).) While the Year in Review's demographic information did not provide all data points from the EEO-1 report, the information disclosed was substantial enough to undermine the Government's claim of confidentiality, and call into doubt the supporting declaration from Gilead's corporate representative that the company treats this information as private and "does not release its EEO-1 reports to the general public…." (Decl. of Mirelle King, Dkt. No. 24-4 at ¶ 5.)

Thus, while the Court need not determine whether the information sought is confidential, there is a significant possibility that at least some of the reports may not be.

**B. Whether the Foreseeable Harm Standard is Satisfied.**

Even if the information was exempt, the Government has failed to carry its burden of showing that foreseeable harm would result should the documents be released.

In 2016, Congress passed the FOIA Improvement Act of 2016 ("FIA"), which amended FOIA to limit the circumstances under which an agency may withhold records from the public. Among other things, the FIA introduced the foreseeable harm standard, which agencies must satisfy for all FOIA requests filed **after** the bill's enactment (June 30, 2016). P.L. 114-185, 130 Stat. 538 (2016) (emphasis added). The foreseeable harm standard prohibits agencies from withholding information unless (1) the agency reasonably foresees that disclosure of the record would harm an interest protected by an exemption, or (2) the disclosure is prohibited by law. 5 U.S.C. § 552(a)(8)(A)(i). Consequently, even if information falls within the scope of a discretionary exemption, it cannot be withheld from the public unless the agency also shows that disclosure will harm the interest protected by that exemption. *Id.*; *see also Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 98 (D.D.C. 2019).

Here, Plaintiffs argue that even if the reports would be otherwise exempt under Exemption 4, the Government has failed to meet its burden under the FIA, because it has not shown that foreseeable harm would result if the records were released. (Pl.'s Opp'n at 13; Amicus Br. At 4.)

Defendant argues that to impose the foreseeable harm standard would render *Argus Leader* meaningless. (Def.'s Reply at 7.) The Court disagrees. The substantial competitive harm test set forth in *National Parks & Conservation Association v. Morton,* 498 F.2d 765, 768 (D.C. Cir. 1974)*,* was fashioned from legislative history, rather than statute, which was the grounds for its abrogation. *Argus Leader*, 139 S. Ct. at 2364. Post-FIA, the foreseeable harm standard applies to all exemptions, and is not restricted to Exemption 4. As discussed at the hearing, the FOIA request in *Argus Leader* was filed before FIA was enacted, so the foreseeable harm standard was not applicable. In fact, the Supreme Court did not address the validity of the foreseeable harm standard. Today, FIA codifies the requirement that the agency articulate a foreseeable harm to an interest protected by an exemption that would result from disclosure. Here, the Government does not attempt to make such a showing, and instead relies on *Argus Leader* as the reason why it need

1 not do so.

Accordingly, the Court finds that the Government has failed to carry its burden under the FIA's foreseeable harm standard.

### C. Segregation

Finally, if the agency determines that full disclosure is not possible, it is required to consider whether partial disclosure is possible and to "take reasonable steps necessary to segregate and release nonexempt information[.]" 5 U.S.C. § 552(a)(8)(ii). Even if the Government showed that its application of Exemption 4 was justified, and there was some foreseeable harm, it would have to take reasonable steps to redact the documents. It made no such attempt.

At the hearing, the Court asked Defendant why it could not, at the very least, redact the documents and produce the total numbers. The Government did not have a response, and asked if it could "look into" that. The Government is free to look into the feasibility of segregation; however, it had an obligation to segregate and release nonexempt information when the request was made, which it did not do.

Accordingly, the Court declines to delay its ruling for that purpose, and finds that the Government did not attempt to segregate nonexempt information as required by statute.

### IV. CONCLUSION

In light of the foregoing, the Court DENIES the Government's motion for summary judgment and GRANTS Plaintiffs' cross-motion for summary judgment. The Government shall produce the 10 remaining EEO-1 reports within 30 days of this order, and shall do so without redaction.

IT IS SO ORDERED.

Dated: December 10, 2019

KANDIS A. WESTMORE
United States Magistrate Judge