DENISE M. MINGRONE (SBN 135224)
dmingrone@orrick.com
ROBERT L. URIARTE (SBN 258274)
ruriarte@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 940255
Telephone:    650 614 7400

ROBERT M. LOEB (*pro hac vice* pending)
rloeb@orrick.com
JAMES ANGLIN FLYNN (*pro hac vice* pending)
jflynn@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005
Telephone:    202 339 8475

Attorneys for SYNOPSYS, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING AND WILL EVANS,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF LABOR,<br><br>Defendant. | Case No. **4:19-cv-1843-KAW**<br><br>**DECLARATION OF SARAH LEE IN SUPPORT OF SYNOPSYS' MOTION TO INTERVENE** |

I, **Sarah Lee**, hereby declare as follows:

1. I am a Vice President, Human Resources, at Synopsys, Inc. I provide this declaration in support of Synopsys, Inc.'s motion to intervene in the above-captioned matter. I have personal knowledge of the facts set forth herein. If called as a witness, I could and would testify competently to the facts set forth in this declaration.

2. I have been working in Human Resources at Synopsys for approximately 19 years. My current responsibilities require me to have a full understanding of Synopsys' Human Resources policies and priorities, data and reporting policies, diversity policies and programs, compensation strategies, and recruiting and retention strategies.

3. Synopsys, Inc. is a high-tech software company founded in 1986. The core of our business is providing innovative Electronic Design Automation (EDA) solutions for the semiconductor industry. EDA generally refers to using computer software to design, verify, simulate, and manufacture electronic circuits. This is a highly competitive technology area that enables the global semiconductor industry to drive technological advancements. Synopsys is a market leader in the EDA industry, operating in 33 countries and employing approximately 14,000 employees worldwide.

4. At Synopsys, we place an emphasis on gender, racial, and ethnic diversity and equal-employment opportunities, including a global campaign supporting women in technology. As a high-tech software company, our assets are our employees. Their satisfaction, safety, security, health, learning, and overall well-being are top priorities. We recruit, develop, and retain highly skilled, extremely scarce talent in engineering, mathematics, physics, and computer science. Given the competitive advantage we derive from the strength and skills of our workforce, we share very little employee data, internally or externally, and we train our employees on the importance of securing privacy.

5. Synopsys' EEO-1 Consolidated Reports Type 2 ("EEO-1 Reports") sought here provide a detailed accounting of the number of employees across the United States who fall within certain job categories, such as "Executive," "Technicians," or "Sales Workers". The EEO-1 Reports further identify the number of employees falling into each of those job categories based

on their self-identified race, ethnicity, and gender.[1] Therefore, the EEO-1 Reports identify the size, demographics, and composition of Synopsys' United States workforce. In addition, the EEO-1 Report for any given year also includes the previous year's reported totals by gender, race, and ethnicity, revealing changes in workforce size and composition over time.

6. In addition, the EEO-1 Reports of other Types (3 and 4) provide data on the exact number of employees Synopsys employs at each Synopsys site in the United States that has 50 or more employees. Those other Types also provide the same accounting across job categories, gender, ethnicity, and race as in the Type 2 Reports sought here, at the even more detailed, site-specific level.

7. Synopsys does not externally share information at this level of specificity, as the EEO-1 Reports disclose precise data that can be assembled and used competitively to Synopsys' disadvantage. Furthermore, to maintain the confidentiality of the data, even within Synopsys, race, ethnicity, and gender data is only made available internally on a limited basis to a small number of Human Resources employees, designated Legal Department employees, senior level management, and employees who work on our diversity initiatives.

8. A ruling that the EEO-1 Reports sought here must be disclosed would mean any person requesting the data could obtain it, including direct competitors and talent competitors. The EEO-1 Reports have material commercial value that can be used by companies in the high-tech industry to benefit themselves and harm competitors. Direct competitors would use that data, if disclosed, to learn more about the business plans of their rivals in order to gain commercial advantages over them. Talent competitors – which would include high-tech companies in our industry and others – would use the data, if disclosed, to assist their recruiting efforts.

9. The EEO-1 Reports can reveal to a competitor important changes in a company's workforce composition year to year. Changes in staffing levels for particular job categories can

---

[1] When an employee declines to self-identify, companies may look to on-boarding records or use visual observation to supply identification information. *See, e.g., Fact Sheet for EEO-1 Survey Filers*, U.S. EEOC, https://www1.eeoc.gov//employers/eeo1survey/fact_sheet_filers.cfm.

reveal changes in business goals and commercial strategies, or the impact of a corporate merger and the resulting workforce composition. For example, a significant increase of "professionals" over the prior year at a high-tech company could reveal a greater focus by the company on product development, while a decrease over the prior year would show the opposite. And reduced or increased numbers in certain categories could reveal a change in a company's balance of domestic and international employees. Thus, disclosure of the sought data could allow a competitor to discern Synopsys' priorities and strategies and use that information to Synopsys' disadvantage.

10. If the data disclosed went beyond the aggregate national data sought here to include site location breakdowns available in related EEO reports, such as Types 3 and 4, that would only increase the commercial value of the data to a competitor and the related harms from disclosure. With site location breakdowns, competitors would even more easily be able to use the EEO-1 data to determine the type of growth or contraction of the identified job category positions at Synopsys at specific location sites. Competitors could use publicly available job postings—which reveal the specific roles advertised at an office location—together with the EEO-1 data to identify the business groups and functions located at a particular site as well as the private demographic information of the employees who fill new roles. Those localized changes by job category can provide substantial insight into a company's business plans, successes, and failures relating to specific businesses or products.

11. The information set forth in those Reports is also commercially valuable as it relates to recruitment and retention. The competition for recruiting and retaining talent is fierce. Having a diverse workforce across gender, ethnic, and racial identities is a key component to the company's commercial success. It ensures that a wide variety of viewpoints contribute to our decision-making, and it helps to make our workplace welcoming and tolerant of employees of all identities and backgrounds. Having an inclusive and diverse workforce is also itself a key component of our ability to continue to recruit additional diverse candidates, many of whom increasingly consider a company's diversity as an important factor when deciding where to work.

12. Talent competitors would use the EEO data sought here in their own recruiting

plans and efforts. Because recruitment and retention of qualified employees is so competitive, companies in the high-tech industry frequently track and monitor the composition of and statistics regarding their competitors' workforces from public sources, such as competitor's own websites and recruiting materials, where available. The EEO data sought here would facilitate such competitive efforts. The data would reveal the success or lack thereof of a company's diversity efforts. Among other things, a competitor could draw lessons from that data, such as whether to try to copy the company's recruitment strategies.

13. Moreover, talent competitors often seek to lure away Synopsys employees. Competitors can be expected to use another company's diversity trends shown by the EEO-1 data sought here to try to lure employees away. For example, Synopsys' EEO-1 Report would reveal to its competitors that Synopsys had a relatively large population of employees in at least one underrepresented group and job category. This would be very valuable information for a company that is trying to hire people from underrepresented groups.

14. And if the EEO data disclosed went beyond to the aggregate national data sought here to include site location breakdowns, talent competitors could localize their efforts to recruit employees in underrepresented groups and in-demand job categories, such as by concentrating job postings and recruitment events near one or more of Synopsys' locations. For example, if it was revealed that Synopsys had a relatively high percentage of women or African-American professionals at a particular location, the competitor could hire recruiters in that area to target Synopsys employees. The competitor could even open an office in the same area of that Synopsys location, to make the move more attractive.

15. The EEO-1 data, together with information available on websites such as LinkedIn, can in some instances allow a competitor or others to identify individual employees by name, and determine how that employee self-identifies, even if that employee has chosen not to reveal their gender, racial, or ethnic self-identification publicly. For example, a Report may list just one or two persons as being of a particular gender or ethnicity in a given job category. Even with nationwide data, several of the subcategories on the Synopsys 2016 EEO-1 Report sought here identify only a single employee of the corresponding role and self-identification. Disclosure

of such EEO-1 data would consequently threaten to reveal that employee's confidential self-identifications and violate their privacy. And if EEO data further broken down by site location is also sought, the release of that even narrower data would make it even easier to identify the gender, racial, or ethnic identity of individual employees.

16. As described in my earlier declaration in support of the Department of Labor's motion for summary judgment, our employees self-identify pursuant to express assurances of confidentiality from Synopsys. Dkt. 24-5, at 1-2. And as I described, in their EEO Survey responses, employees may disclose aspects of their self-identification that they do not broadcast publicly. *Id.* at 2. If the EEO-1 Reports were disclosed, the resulting violations of employee privacy would understandably chill our employees' willingness to self-identify in future EEO Surveys. This would have the perverse effect of undercounting our diverse employees, and it would be counterproductive to our own efforts to recruit and retain a diverse workforce.

17. The 2016 EEO-1 data was submitted to the Department of Labor with the assurance of confidentiality and privacy, an assurance that Synopsys passed on to its employees at the time they self-identified themselves. Disclosure of the data now would require that Synopsys explain to its employees why and how our protected data was released, and why their privacy was violated. Such an internal discussion would be unproductive, it would undermine employees' trust in Synopsys' ability to safeguard their privacy, and it would distract from Synopsys' important and on-going diversity initiatives.

18. Synopsys' internal diversity efforts, like our global campaign supporting women in technology, are some of our highest company-wide priorities. In the time since the 2016 EEO-1 Report was submitted, our U.S. workforce has expanded by roughly 17%, while experiencing turnover at a rate of roughly 11%. Our workforce demographics are continually evolving, and the data in the EEO-1 Reports at issue in this action differ from Synopsys' current demographics. The data contained in these outdated EEO-1 reports could be mischaracterized to suit the purpose of the user, leaving Synopsys open to public and private claims that are self-serving and erroneous. For example, a talent competitor, upon learning that a potential minority or female candidate considers Synopsys instead of its own company as his or her first choice for employment, could

use the EEO-1 data to attempt to negatively characterize Synopsys' work environment as unfriendly towards minorities or females. (Conversely, as noted in paragraph 13 above, talent competitors could use the EEO-1 diversity data to focus their recruiting on certain groups of Synopsys employees.) Similarly, a newspaper organization (such as the plaintiff here) could seek to mischaracterize the Synopsys workplace and diversity culture, based on incomplete information in order to support a desired narrative, before the broader public. Disclosure of these particular EEO-1 Reports would present an incomplete picture which – coupled with potentially misleading interpretations of the data by the plaintiff and others – could directly harm Synopsys through the departure of diverse talent, the inability to attract new diverse talent, or a combination of both. It also would undermine the on-going diversity initiatives within Synopsys itself.

19. For all of these reasons, release of the EEO-1 data would impose material commercial losses on the companies who submitted such data, as well as permit company competitors to gain unfair and significant benefits. Given the fact that the companies who submitted this competitively sensitive data relied on the government's assurances that it would be treated confidentially, it should be each individual company – and not the government – who decides whether or not this data should be released or otherwise published.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 30th day of January 2020, at Mountain View, CA.

_____
Sarah Lee